UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Melissa Jenks, g/n/f of
Roderick Jenks, and
Melissa Jenks, Individually

       v.                           Civil No. 09-cv-205-JD
                                       Opinion No. 2010 DNH 038

New Hampshire Motor Speedway,
Inc., f/k/a New Hampshire
Speedway, Breann M. Thompson,
Textron, Inc., and "John Doe,
Inc.," Unknown Golf Cart
Manufacturer

O R D E R

Melissa Jenks, acting both as the guardian and next friend
of her husband, Roderick Jenks, and on her own behalf, sued New
Hampshire Motor Speedway ("NHMS"), Breann Thompson, Textron,
Inc., and "John Doe, Inc.," an unknown golf cart manufacturer.
Jenks brought claims of negligence against Thompson (Count I) and
NHMS (Count II), a claim of vicarious liability against NHMS
(Count III),[1] product liability claims against John Doe, Inc.
(Count IV) and Textron (Count V), a claim for damages against

---

[1]Count III was initially brought against Checkered Flag
Snack Bar, but NHMS was substituted after it acknowledged that it
owned and operated Checkered Flag Snack Bar and was therefore the
appropriate party.  (This also resulted in the dismissal of
Textron's cross-claims against Checkered Flag Snack Bar.)

each defendant (Count VI), and a claim for loss of consortium against each defendant (Count VII).  Textron cross-claimed for contribution and indemnification from NHMS and Thompson.  NHMS and Thompson now move for summary judgment on Counts I, II, III, and VI.  Both Jenks and Textron object.

<u>Background</u>[2]

On Saturday, July 15, 2006, Rodney Jenks and his wife, Melissa, participated in a program at the NHMS racetrack in Loudon, New Hampshire, in which they worked at NHMS in exchange for NHMS's contribution to a charity of each volunteer's choice.[3] Mr. Jenks worked a security detail, while Mrs. Jenks was on cleaning detail.  They were signed up to work both July 15 and July 16, and the proceeds were to go to a charity called "Fishin' for Kids, Inc."

On Sunday, July 16, 2006, Mr. Jenks reported to work in the early hours of the morning.  Mrs. Jenks had not arrived yet because she was asked to report at 10:00 a.m.  At approximately 6:00 a.m., Mr. Jenks was walking along the roadway in the

---

[2]Except where a dispute is noted, the facts are taken from the undisputed portions of the parties' filings.

[3]The parties refer to such workers as "volunteers" despite the fact that they were being compensated in the form of donations to the charity of their choice.

racetrack infield with another volunteer, Marc MacAlpine.  They saw Thompson, an employee of NHMS, driving a golf cart toward them, and they flagged her down to ask for a ride.  Thompson agreed to give them a ride to the other side of the infield.  The golf cart had only two seats, one of which was occupied by Thompson.  MacAlpine sat in the passenger seat, while Mr. Jenks rode in the rear of the cart, where golf clubs are typically carried.  Thompson drove a short distance when, according to her declaration, "someone . . . unexpectedly and abruptly appeared to be entering the cart's path."  Defts.' Memo., Exh. B, at ¶ 9. Thompson swerved to avoid hitting that person, and Mr. Jenks fell off the back of the golf cart, suffering serious head injuries.

Approximately one week before Mr. and Mrs. Jenks were scheduled to work at NHMS, they, along with others donating their time on behalf of Fishin' for Kids, attended a one-hour orientation run by Deborah O'Neil.  O'Neil informed the participants about the type of work they would be performing, in which area of the track they would be working, the time they had to report to work, and what they had to wear.  O'Neil also told the workers that they would be representing NHMS, and therefore they were expected to be courteous to NHMS customers and behave and dress appropriately.

At the orientation, O'Neil asked the workers "to put [their] names on the 'sign up sheet' that was presented."[4]  Pl.'s Memo., Exh. I ("Jenks Aff.") at ¶ 2; Exh. J ("Ottman Aff.") at ¶ 2. Pamela Ottman, another Fishin' for Kids worker, remembers that there was a different document, a "sign in" sheet, when she entered the racetrack on July 15, 2006, but that the July 15 sign in sheet did not resemble the "sign up sheet" presented at the orientation.[5]  Mrs. Jenks states that she "was not required to sign a similar document before entering the raceway" on July 15. Jenks Aff. at ¶ 3.

---

[4]In their motion for summary judgment, NHMS and Thompson stated that Mr. Jenks executed a Release Agreement "[p]rior to entering the [racetrack] on each of the two days of his assignment, including the day of the accident."  Pl.'s Memo. at 3.  They also stated that Mrs. Jenks executed the Release Agreement "on both of the days of the weekend of the accident." In her objection, Mrs. Jenks states that the releases were signed at the orientation meeting.  NHMS and Thompson, in their reply, "acknowledge that Mr. Jenks might have executed the Release Agreement at [the] orientation" and state that they intended, in their motion, to say that Mrs. Jenks signed the agreement "for both of the days of the weekend . . . rather than signed on both days."  Defts.' Reply at 1 (emphasis in original).

[5]Pamela Ottman's affidavit states that she remembers a sign in sheet when she entered the Speedway on "Saturday, July 16, 2006."  Ottman Aff. at ¶ 3.  It also states, however, that she "never made it to the Speedway on Sunday, July 16, 2006" because she heard about the accident and went straight to the hospital. Id. at ¶ 5.  It appears, therefore, that "Saturday, July 16" was a typographical error, and that it was intended to read "Saturday, July 15."

At the orientation, Ottman and Mrs. Jenks each signed two
forms.  The forms are identical, each consisting of one page
entitled "Release and Waiver of Liability and Indemnity
Agreement" ("Release Agreement").  <u>See</u> Defts.' Memo., Exh. C.
They are both printed forms stating that

> In consideration of being permitted to enter for any
> purpose any RESTRICTED AREA . . . or . . . participate
> in any way in the event, EACH OF THE UNDERSIGNED, for
> himself, his personal representatives, heirs, and next
> of kin . . . HEREBY RELEASES, WAIVES, DISCHARGES AND
> COVENANTS NOT TO SUE the promoter, participants, racing
> association, sanctioning organization or any
> subdivision thereof, track operator, track owner . . .
> their officers and employees . . . from all liability
> to the undersigned, his personal representatives,
> assigns, heirs, and next of kin for any and all loss or
> damage, and any claim or demands therefore on account
> of injury to the person or property or resulting in
> death of the undersigned, whether caused by the
> negligence of the releasees or otherwise while the
> undersigned is in or upon the restricted area, and/or .
> . . working for, or for any purpose participating in
> the event.

<u>Id.</u>  At the very top, the forms state, in large bold letters,
"THIS IS A RELEASE OF LIABILITY."  The bottom portion of each
form contains a chart with five columns: "permit type," "permit
number," "permit name," "signature," and "print affiliation."
The first two columns on each form are empty, and the next two
contain the words "I HAVE READ THIS RELEASE," which appear on
each line and completely fill those two columns.  Above the
heading "print affiliation" someone handwrote "Fishin for Kids."

5

Below the heading "print affiliation" appear the handwritten names of several of the workers, including Melissa Jenks, Roderick Jenks, Bruce Ottman, and Pamela Ottman.

On the first form, the words "Fishin for Kids Inc; Saturday 10 Infield; 2 cleaning," followed by the number "12" inside a circle appear in large, bold handwriting over some of the printed words.  The handwriting is several times larger than any of the printed portions of the form, and obscures much of the first and second paragraphs of the form.[6]  The second form bears the same large, bold handwritten language, except that it says "Sunday" instead of "Saturday."  Both Mrs. Jenks and Ottman state that no one ever explained to them the "'release of liability' or its purpose or consequence."  Jenks Aff. at ¶ 4; Ottman Aff. at ¶ 4.

## Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must

---

[6]Indeed, in order to discern the language of the release, it is necessary to compare the two forms and, where a word is obscured on one form, read the other form to determine what the word is.

first demonstrate the absence of a genuine issue of material fact in the record.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party.  See id. at 255.  "To be entitled to summary judgment, the party with the burden of proof must provide evidence sufficient for the court to hold that no reasonable trier of fact could find other than in its favor."  Am. Steel Fabricators, Inc. v. Local Union No. 7, 536 F.3d 68, 75 (1st Cir. 2008).

## Discussion

Thompson and NHMS move for summary judgment on Jenks's negligence claims in Counts I, II, and III, arguing that the Release Agreements relieve them of all liability.  They also move for summary judgment on Count VI, on the ground that New Hampshire does not recognize a stand-alone claim of "damages."

With regard to Counts I, II, and III, Mrs. Jenks objects, arguing that the Release Agreements are unenforceable because they violate public policy, because a reasonable person in Mr. Jenks's situation would not have understood the import of the

7

release,[7] and because their claims were not within the
contemplation of the parties at the time they executed the
Release Agreements.[8]  With regard to Count VI, Mrs. Jenks states
that it is not a separate cause of action, but rather a claim for
damages premised on the causes of action alleged in the other
counts of the complaint.

A.   Enforceability of the Release Agreements

      "In New Hampshire, exculpatory contracts are generally
prohibited."  Barnes v. New Hampshire Karting Ass'n, 128 N.H.
102, 106 (1986).  Exculpatory contracts will be enforced,
however, if: "(1) they do not violate public policy; (2) the
plaintiff understood the import of the agreement or a reasonable
person in his position would have understood the import of the
agreement; and (3) the plaintiff's claims were within the
contemplation of the parties when they executed the contract."
McGrath v. SNH Development, Inc., 158 N.H. 540, 542 (2009)
(quoting Dean v. MacDonald, 147 N.H. 263, 266-67 (2001)).

_____

      [7]As the parties appear to acknowledge, at least for purposes
of this motion, the release of liability at issue is that of Mr.
Jenks, not Mrs. Jenks.

      [8]Textron also objects to summary judgment, making
substantially the same argument.

8

In examining whether a reasonable person in Mr. Jenks's position would have understood the import of the Release Agreements, the court "will assess the clarity of the contract by evaluating it as a whole."  <u>Wright v. Loon Mtn. Recreation Corp.</u>, 140 N.H. 166, 169 (1995).  "[T]he terms of the contract are strictly construed against the defendant, [and] the contract must clearly state that the defendant is not responsible for the consequences of his negligence."  <u>Barnes</u>, 128 N.H. at 107.  The intent to release the defendant from liability must be "clearly and specifically indicate[d]."  <u>Id.</u>

Mrs. Jenks raises a disputed issue of material fact relevant to this inquiry, namely, the circumstances surrounding Mr. Jenks's signing of the Release Agreements.  Mrs. Jenks and Pamela Ottman recall that the volunteers were asked to put their names on a sign up sheet at the orientation, but there was no indication that the form was a release.  Moreover, some of the release language is obscured by the large, bold handwriting, and the record does not show whether the writing was done before or after Mr. Jenks signed the form.  A reasonable person who is asked to put his name on a sign up sheet that has large, bold handwriting on it indicating the dates on which he is to work might not understand that he is signing a broad release of liability.  The release of liability was not clearly stated

because it may have been obscured both by the way in which the forms were presented to the participants and the handwriting that physically obliterates some of the language of the release.

In their reply, NHMS and Thompson suggest that the handwriting may have been added to the form after the volunteers signed it at their orientation.  They cite NHMS's answer to an interrogatory, in which Bruce Stone, NHMS's Vice President of Events, stated that he "underst[oo]d from Ms. O'Neil that the practice as of July 16, 2006 was for the staff at the volunteer sign-in table to label the waivers with the date and group upon receipt of the document as signed by the volunteers."  Pl.'s Memo., Exh. A at 9.  NHMS and Thompson argue that no one has submitted evidence that NHMS deviated from this practice with the Release Agreements in question, and apparently asks the court to infer that the practice was followed in this instance.

A defendant's reliance on a release of liability asserts an affirmative defense.  See Gagnon v. Lakes Region General Hospital, 123 N.H. 760, 765 (1983) (holding that "the assertion that the release bars the plaintiff's suit . . . is an affirmative defense"); see also Fed. R. Civ. P. 8(c)(1) (stating that a release is an affirmative defense).  The burden of proof is on NHMS and Thompson to show that the release is valid.  See Gagnon, 123 N.H. at 765; Piascik-Lambeth v. Textron Automotive

10

Co., 00-258-JD, 2000 WL 1875873, at *3 (D.N.H. Dec. 22, 2000)
("Under both federal and [New Hampshire] law, the proponent of a
release, as a defense to a claim, bears the burden of proving the
effectiveness of the release.") (citations omitted).  To be
entitled to summary judgment on the basis of the release,
therefore, NHMS and Thompson "must provide evidence sufficient
for the court to hold that no reasonable trier of fact could find
other than in [their] favor."  Am. Steel Fabricators, Inc., 536
F.3d at 75.

The evidence of NHMS's purported practice regarding labeling
releases after they were signed by volunteers is insufficient to
carry the burden of proof of NHMS and Thompson on their
affirmative defense.  In the same set of answers to Mrs. Jenks's
interrogatories, Stone, on behalf of NHMS, states that he was
"told by Ms. O'Neil that it is her practice to have volunteers
sign either a roster or a release for each day they volunteer at
the Speedway," and that "those working in the infield were
required to sign the release, and others were to sign the
roster."  Pl.'s Memo., Exh. A at 13.  As Mrs. Jenks points out in
her objection, however, both Release Agreements bear the
signatures of all the Fishin' for Kids volunteers, not just those
assigned to the infield.  Because NHMS did not follow its
purported practice with respect to one detail surrounding the

11

handling of the Release Agreements, an inference cannot be made that NHMS followed its purported practice with respect to when the writing was added to the Release Agreements.

Whether a reasonable person in Mr. Jenks's situation would have understood the import of the Release Agreements is a disputed issue of material fact.  Because Mrs. Jenks has shown a genuine issue for trial, summary judgment based on the affirmative defense of a release is denied.  Anderson, 477 U.S. at 256.


B.   Count VI

Jenks states in her objection that she did not intend to allege a separate cause of action in Count VI, but rather intended only "to assert a claim for damages premised on the causes of action previously alleged in the complaint."  Thus, there is no separate legal theory to dismiss.  The paragraphs under the heading "Count VI" are understood to comprise a claim for damages for each of the causes of action listed in Counts I through V, and are considered incorporated therein.  "Count VI" is not dismissed.

12

Conclusion

For the foregoing reasons, Thompson and NHMS's motion for summary judgment on Counts I, II, III, and VI is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

March 3, 2010

cc:  R. Matthew Cairns, Esquire
     R. Peter Decato, Esquire
     Neil A. Goldberg, Esquire
     Derek D. Lick, Esquire
     Michael D. Shalhoub, Esquire
     William A. Whitten, Esquire